## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### FILED *IN CAMERA* AND UNDER SEAL

#19190

FILED

SEP 20 2006

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

**UNITED STATES OF AMERICA,**
*ex rel.* **JESSE J. DICK, JR. and TAMELA**
**BRAGG,**

      **Plaintiff,**

v.                                   Civil Action No. 3:06-0723

                                   Judge _____

**CORNERSTONE HEALTH MANAGEMENT**
**COMPANY, d/b/a CORNERSTONE HOSPITAL**
**OF HUNTINGTON, a Delaware corporation,**
**CORNERSTONE HOSPITAL OF HUNTINGTON, LLC, a**
**Delaware limited liability company, and CHG CORNERSTONE**
**HEALTHCARE GROUP, L.P. d/b/a CORNERSTONE**
**HEALTHCARE GROUP, a Texas limited partnership,**

      **Defendants.**

### COMPLAINT

**COMES NOW**, Plaintiff, United States of America *ex rel* Jesse J. Dick, Jr. and

Tamela Bragg, by counsel, and respectfully represents unto the Court as follows:

### PRELIMINARY STATEMENT

1.      This action, commonly referred to as a "Qui-tam action", is filed pursuant

to the criminal and civil provisions of 42 U.S.C. § 1320a-7a and 1320a-7b and the False

Claims Act, 31 U.S.C. § 3729, *et seq.*, alleging multiple violations of 31 U.S.C. § 3729,

*et seq* and 42 U.S.C. § 1395 *et seq.*

2.     At all times relevant to this action, Relator, Jesse J. Dick, Jr., was employed by Defendant, Cornerstone Hospital of Huntington, LLC and/or Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington.

3.     Mr. Dick is an "original source" of the information on which the allegations contained herein are based, as that term is defined in 31 U.S.C. § 3730(e)(4).

4.     At all time relevant to this action, Relator, Tamela Bragg, was employed by Defendant, Cornerstone Hospital of Huntington, LLC and/or Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington.

5.     Ms. Bragg is an "original source" of the information on which the allegations contained herein are based, as that term is defined in 31 U.S.C. § 3730(e)(4).

6.     Mr. Dick alleges that during the course of his employment with Defendant, Cornerstone Hospital of Huntington, LLC and/or Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington, he witnessed, and reported to his superiors, numerous counts of fraudulent Medicare billing.

7.     Ms. Bragg alleges that during the course of her employment with Defendant, Cornerstone Hospital of Huntington, LLC and/or Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington, she witnessed, and reported to her superiors, numerous counts of fraudulent Medicare billing.

8.     Mr. Dick and Ms. Bragg allege that despite their continuous reporting of the fraudulent billing practices at Defendant, Cornerstone Hospital of Huntington, LLC and/or Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington, the executives and supervisors at Defendant, Cornerstone Hospital of

Huntington, LLC and/or Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington, at the direction of the executives and supervisors of the parent corporation CHG Cornerstone Healthcare Group d/b/a Cornerstone Healthcare Group, continued to engage in and forced employees to engage in blatant and pervasive fraudulent Medicare billing practices.

### PARTIES

9.      Relator, Jesse Dick, Jr., was at all times pertinent herein, a citizen and resident of Poca, Putnam County, West Virginia.

10.      Relator, Tamela Bragg, was at all time pertinent herein a citizen and resident of Portsmouth, Ohio.

11.      Defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington is a Delaware corporation with its principal place of business in Huntington, West Virginia.

12.      Defendant, Cornerstone Hospital of Huntington, LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts and doing business in Huntington, West Virginia.

13.      Defendant, CHG Cornerstone Healthcare Group, L.P. d/b/a Cornerstone Healthcare Group, is a Texas limited partnership with its principal place of business in Austin, Texas and doing business in Huntington, West Virginia.

### JURISDICTION AND VENUE

14.      This "Qui-tam" action is brought pursuant to the criminal and civil provisions of 42 U.S.C. § 1320a-7a and 1320a-7b and the False Claims Act, 31 U.S.C. §

3

3729, *et seq.*, alleging multiple violations of 31 U.S.C. § 3729, *et seq.* and 42 U.S.C. § 1395 *et seq.*

15.     Subject matter jurisdiction is conferred in this Court by 28 U.S.C. § 1331, because this action arises under the laws of the United States of America.

16.     This Court has personal jurisdiction over Defendants under 31 U.S.C. §3732(a), because at least one defendant, Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington is located in the Southern District of West Virginia and all defendants have committed acts proscribed by 31 U.S.C. § 3729-33 and 42 U.S.C. § 1395 *et seq.* Any action under section 3730 may be brought in any judicial district in which the defendant, or, in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3730 occurred, 31 U.S.C. § 3732(a).

17.     Venue is proper in the Southern District of West Virginia under 31 U.S.C. §3732(a), because at least one Defendant transacts, or has transacted business in the Southern District of West Virginia.

## NATURE OF THE CASE

18.     This case is brought under the False Claims Act, alleging that all Defendants are liable for fraudulent Medicare billing under 42 U.S.C. § 1320a-7a and 1320a-7b, in violation of 31 U.S.C § 3729 et. seq. and 42 U.S.C. § 1395 *et seq.* , as follows:

4

a.     Any corporation that knowingly presents, or causes to be presented, to the United States, a false or fraudulent claim for payment or approval is liable for damages and penalties under 31 U.S.C. § 3729(a)(1) of the False Claims Act;

b.     Any corporation that knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government is liable for damages and penalties under 31 U.S.C. § 3729(a)(2) of the False Claims Act;

c.     Any corporation that conspires to defraud the Government by getting a false or fraudulent claim allowed or paid, is liable for damages and penalties under 31 U.S.C. § 3729(a)(3) of the False Claims Act; and

d.     Any corporation that violates the provisions set forth in 42 U.S.C. § 1395 *et seq.* shall be held liable as set forth in 42 U.S.C. § 1320a-7a and 1320a-7b.

19.     The False Claims Act provides that any person that knowingly or with deliberate ignorance or reckless disregard of the truth, submits a false or fraudulent claim to the United States for payment or approval, is liable for a civil penalty of not less than $5,000 and not more than $10,000 for each such claim, plus 3 times the amount of damages sustained by the Government as a result of the false claims, 31 U.S.C. § 3729(a).

20.     The False Claims Act allows any person, called a Relator, having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court on behalf of the United States, and to share in any recovery, 31 U.S.C. § 3730(b) and (d)

**FACTS**

21.     Relator, Jesse Dick, Jr., is a male who was employed by Cornerstone Health Management Company d/b/a Cornerstone Hospital of Huntington and/or Cornerstone Hospital of Huntington, LLC (hereinafter collectively referred to as "CHH"), as a Materials Manager from October, 2005 to May, 2006.

22.     Relator, Tamela Bragg, is a female who was employed by CHH as a Unit Clerk from May, 2005 to June, 2006.

23.     During the course of his job duties, Mr. Dick, discovered that Defendants were involved in an ongoing scheme of filing false claims for Medicare reimbursement.

24.     During the course of her job duties, Ms. Bragg, discovered that Defendants were involved in an ongoing scheme of filing false claims for Medicare reimbursement.

**Fraudulent Medicare Billing Practices Observed by Relator, Jesse Dick, Jr.**

25.     In October, 2005, Mr. Dick became aware that CHH was engaged in routine over billing, double billing, charging for unnecessary tests and durable medical equipment and charging for items without a doctor's order.   Moreover, even if there was a doctor's order, the nurses would not follow it in order to save money.

26.     Upon realizing that CHH was engaged in Medicare fraud, Mr. Dick requested a meeting with Chief Executive Officer of CHH ("CEO"), Christina Stover, and the Chief Financial Officer ("CFO") Monica Stevenson.

27.     During that meeting Mr. Dick showed Ms. Stover and Ms. Stevenson charge stickers from patient bills which reflected charges for the same thing twice and which reflected charges for medical supplies and equipment without a doctor's order.

28.     Following that meeting, Ms. Stover e-mailed CHH's parent corporation CHG Cornerstone Healthcare Group, L.P. d/b/a Cornerstone Healthcare Group ("CHG") regarding the fraudulent billing reported by Mr. Dick.[1]

29.     Ms. Stover later informed Mr. Dick that CHG did not have any concerns about what was going on at CHH.

30.      In November 2005 Mr. Dick again reported CHH's ongoing and pervasive fraudulent billing practices to Ms. Stover and Ms. Stevenson.

31.     Again, Mr. Dick was told that CHG would make sure everything was being done legally.

32.     In December, 2005, the CFO, Monica Stevenson was fired and Regina Walters, interim CFO, started coming to CHH from CHG.

33.     While there, Ms. Walters revised and backdated all purchase orders and paperwork from the day CHH opened.

34.     Ms. Walters instructed Mr. Dick and other employees to copy and re-sign each revised purchase order.

35.     Mr. Dick reported CHH's fraudulent billing practices to Ms. Walters on many occasions.  However, Ms. Walters indicated that she wanted to increase the amount of fraudulent billing.

---

[1]  See Affidavit of Christina Stover, attached hereto and incorporated herein as *Exhibit 1*.

36.     Ms. Walters instructed Mr. Dick and other employees to double charge for things such as tube feedings, which were already being billed as part of the room and board, to the patients' insurance.

37.     During this time, CHH was also charging for rental machines, without doctors' orders.

38.     In January 2006, Mr. Dick contacted Jenny Craft, a former Medicare inspector, to make sure that what he perceived to be fraudulent Medicare billing was in fact fraudulent. Ms. Craft stated "You are correct and you can go to jail for doing that."[2]

39.     During this time, Mr. Dick began noticing that CHH had started charging patients for very expensive specialty beds and other items without doctors' orders.

40.     CHH was also charging patients with Do Not Resuscitate orders for elemetry.[3] Again, these charges were not ordered by a physician and were completely unnecessary.

41.     The only person qualified to monitor telemetry at CHH was the Unit Clerk, Tammy Bragg, but CHH required untrained personnel to perform this task.

42.     In February 2006, Christina Stover was fired without explanation. Mr. Dick was informed by a co-worker that "Christiana Stover was dismissed because of her involvement in reporting the fraud that [Mr. Dick] had uncovered."

---

[2]  The Relators have and are continuing to attempt to contact Ms. Craft to obtain an Affidavit from her regarding her expected testimony.
[3]  Telemetry monitors heart function and would not be necessary on a patient who had orders not to resuscitate.

8

43.     Coinciding with Ms. Stover's discharge, was an increase in the number of illegal charges added to the list of patient charges.

44.     In March 2006, CHH became even more aggressive in its fraudulent billing practices. CHG sent word that CHH was to charge for everything including, but not limited to, straws, combs, toothbrushes, and toothpaste, all of which were already included in the patients room and board charge.

45.     Additionally, the staff was instructed to charge multiple patients (regardless of need) for expensive items like specialty chairs, without a doctor's order, and, in most case, without actually providing the chair.

46.     Nurses would decide which patients would receive specialty beds and which ones would not. Action was taken without a doctor's order on the patients' chart and without regard as to whether the patient needed the expensive item.

47.     CHH would charge one patient for a $60.00 box of exam gloves and then proceed to use the box on other patients.

48.     Mr. Dick informed new CFO, Brandy Lusher about the blatant and pervasive fraudulent billing practices at CHH.

49.     Ms. Lusher did nothing.

50.     When the Vice-President of Operations at CHG, Billie Ann Shoppman, came to CHH she informed everyone that revenue must be increased.

51.    In support of this goal, CHH employees were instructed by interim CEO, James Cook, to discard patients after a 25-day length of stay if they did not have another form of insurance.[4]

52.    The employees were instructed that CHH should "keep the patient until they either died or their 25 days are up."

53.    During this period, CHH saw an increased volume in patient deaths resulting from failure to provide the correct drugs, failure to provide any care at all, and failure to carry out physician orders.

54.    In May 2006, CFO Brandi Lusher gave Mr. Dick the option to either quit or be fired. During that meeting, also attended by Vice-President of CHG, Billie-Ann Shoppman, Ms. Lusher accused Mr. Dick of failing to sign purchase orders and obtain CEO approval prior to ordering supplies. These were the same purchase orders which Regina Walters had falsified several months earlier. Moreover, Mr. Dick had been given the authority to order supplies online and without approval of the CEO when he was hired at CHH.

55.    During that same meeting, Mr. Dick informed Ms. Lusher that "you know CHH is committing Medicare fraud and I do not want to go to jail for this." Ms. Lusher responded, "It won't be you who will be put in jail for this."

56.    When it became clear that Mr. Dick would not put his name on the falsified purchase orders and engage in blatant illegal conduct, Ms. Lusher became mad and said, "I'm going to fire you as I had planned."

---

[4]    The length of Long Term Acute Care provided for under Medicare.

**Fraudulent Medicare Billing Practices Observed by Relator, Tamela Bragg**

57.     In June 2005, Ms. Bragg was given a patient charge sheet containing approximately 25-30 items to be charged to patients. Ms. Bragg was instructed to go to each patient room, each day, and to charge any item on the list seen in a patients room.

58.     In August, 2005, Christina Stover questioned Ms. Bragg as to why specialty chairs, specialty beds and IV poles were not being charged to each patient daily.

59.     Ms. Bragg informed Ms. Stover that that not all patients had doctors' orders for these specialty items.

60.     Ms. Bragg was then instructed to "ALWAYS" charge for a specialty bed, specialty chair and IV pole for every patient, everyday.

61.     In September, 2005 Ms. Bragg went to the Director of Nursing, Cyndi Sloan, and Christina Stover about respiratory related charges on the charge sheets. Ms. Bragg informed Ms. Sloan and Ms. Stover that she spoken with Andy Rayburn, Director of Respiratory Therapy, and he stated that Respiratory Therapy did their own separate charges on all respiratory items including vents, EKG's, oxygen and anything else respiratory related. Consequently, patients being provided respiratory treatment were being double charged.

62.     Ms. Bragg further discussed the fact that lab tests, ordered by physicians, were not being conducted. However, patients were still being charged as if the tests had been done.

63.     Ms. Sloan informed Ms. Bragg that she was to continue to do the charge sheets as instructed. Ms. Sloan stated that Ms. Bragg should "stick to clerking" and that administration would take care of the charges for all of the numerous missed labs.

64.     In late October 2005, Ms. Bragg had a meeting with Shari Brumfield, the only other clerk;, Ramona Shamblin; Cyndi Sloan and Jeanne Hayson; regarding the charge sheets. During that meeting Ramona Shamblin, Cyndi Sloan and Jeanne Hayson admitted that patients were being double charged for respiratory treatment and had been since CHH opened.

65.     Ms. Bragg was further informed to keep the information confidential and that it was not to leave the room.

66.     Ms. Bragg and Ms. Brumfield both expressed their uneasiness with what CHH was doing. Both were told to continue doing the charge sheets and that CHH would take care of it. Ms. Sloan further stated "well we have lost money in other ways and this makes up for it."

67.     In November 2005, Ms. Bragg again went to Ramona Shamblin about patients were being charged for items that they were not using.

68.     Following her meeting with Ms. Shambin, Cyndi Sloan called Ms. Bragg into her office and instructed her to charge at least three people a day for a specialty chair regardless of necessity or doctors' orders.

69.     Ms. Sloan further instructed Ms. Bragg that Triline Bed company kept expensive specialty beds in the stockroom at CHH so every patient was to be charged for a specialty bed.

70.     Ms. Bragg again stated that she did not see any physician orders so the items could not be charged to the patient.

71.     Ms. Bragg also showed Ms. Sloan specific patient charts where lab orders had been missed but charged to the patient.

72.     Ms. Bragg informed Ms. Sloan that she would charge for these items and wanted to call St Mary's lab to cancel all of the missed labs.

73.     Ms. Sloan told Ms. Bragg that she had an "attitude problem." Ms. Sloan further stated "these chairs have to get paid for somehow.  You will charge the patients and you have been warned about your attitude."

74.     In January 2006, Ms. Bragg again went to Ramona Shamblin regarding patient charges. On this occasion, Ms. Bragg questioned why patients were being put on Telemetry without doctors' orders and why patients were being restrained without doctors' orders.

75.     As with all such previous discussions, Ms. Shamblin was unable or unwilling to give an answer.

76.     In February 2006, Ms. Bragg took a short leave of absence to undergo a surgical procedure.  Upon her return, she was approached regarding daily patient charge sheets which were not completed while she was out.

77.     Ms. Bragg was instructed to back date the charge sheets, but she refused. Upon information and belief, Jackie Laney, CNA, and Shari Brumfield, Unit Clerk, were instructed to and did falsify these documents.

13

78.    In April 2006, Ms. Bragg was instructed by Cyndi Sloan to charge for at least four needle sticks per each patient daily. These were to be charged regardless of whether the needles were actually used. Again, there were no doctors' orders for these charges.

79.    In May, 2006, Ms. Bragg was terminated for allegedly hanging up on an employee at St. Mary's Hospital while attempting to obtain orders for a patient who had been admitted to CHH the evening before but had not received treatment of any kind for thirteen hours.

## COUNT I
### BILLING MEDICARE FOR SERVICES NOT RENDERED IN VIOLATION OF 42 U.S.C. § 1395 *et seq.* AND THE FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et. seq.*

80.    Plaintiff realleges and incorporate herein the facts asserted in Paragraphs 1 through 79 above as if set forth herein verbatim.

81.    Defendants were engaged in ongoing and pervasive scheme of submitting fraudulent claims for medical services and equipment, that were never provided, to Medicare for reimbursement. These actions include, but are not limited to, the submission of charges for specialty equipment such as chairs and beds which were never ordered by a physician nor provided to the patient; labs which were neither ordered by a physician nor provided to the patient; durable medical equipment which was not ordered by a physician nor required by the patient and; Telemetry which was not ordered by a physician nor required by the patient.

14

82.     As a direct and proximate result of Defendants' unlawful conduct in violation of 42 U.S.C. §1395 *et seq.*, the Plaintiff is entitled to all damages and remedies available under 42 U.S.C. § 1320a-7a and 1320a-7b and 31 U.S.C. § 3729 *et. seq.*

## COUNT II
## FALSLY REPRESENTING THE TYPE OF SERVICES PERFORMED IN VIOLATION OF 42 U.S.C. § 1395 *et seq.* AND THE FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et. seq.*

83.     Plaintiff realleges and incorporate herein the facts asserted in Paragraphs 1 through 82 above as if set forth herein verbatim.

84.     Defendants were engaged in ongoing and pervasive scheme of falsely representing the type of services performed in order to obtain Medicare reimbursement. These actions include, but are not limited to, the submission of charges for durable medical equipment when different and less expensive equipment or no equipment at all was provided to the patient; Labs which were neither ordered by a physician nor provided to the patient; Respiratory services which were neither ordered by a physician nor required by a patient or which had already been billed to the patient and; Telemetry which was not ordered by a physician nor required by the patient.

85.     As a direct and proximate result of Defendants' unlawful conduct in violation of 42 U.S.C. §1395 *et seq.*, the Plaintiff is entitled to all damages and remedies available under 42 U.S.C. § 1320a-7a and 1320a-7b and 31 U.S.C. § 3729 *et. seq.*

## COUNT III
## UNBUNDLING OR FRAGMENTATION OF CHARGES IN VIOLATION OF
## 42 U.S.C. § 1395 *et seq.* AND THE FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et. seq.*

86.     Plaintiff realleges and incorporate herein the facts asserted in Paragraphs 1 through 85 above as if set forth herein verbatim.

87.     Defendants were engaged in ongoing and pervasive scheme of double billing for medical services, medical supplies and durable medical equipment in order to obtain Medicare reimbursement.   These actions include, but are not limited to, the submission of charges for individual items which were also billed as part of the patients room and board (e.g. latex gloves, straws, combs, toothbrushes, and toothpaste); the submission of charges for tube feedings; the submission of charges for IV Poles and; the submission of charges for Respiratory services which were already charged to the patient by the Respiratory therapist.

88.     As a direct and proximate result of Defendants' unlawful conduct in violation of 42 U.S.C. §1395 *et seq.*, the Plaintiff is entitled to all damages and remedies available under 42 U.S.C. § 1320a-7a and 1320a-7b and 31 U.S.C. § 3729 *et. seq.*

## COUNT IV
## MISREPRESENTATION OF PATIENT DIAGNOSIS TO JUSTIFY PAYMENT
## IN VIOLATION OF 42 U.S.C. § 1395 *et seq.* AND THE FALSE CLAIMS ACT, 31
## U.S.C. § 3729 *et. seq.*

89.     Plaintiff realleges and incorporate herein the facts asserted in Paragraphs 1 through 88 above as if set forth herein verbatim.

16

90.    Defendants were engaged in ongoing and pervasive scheme of misrepresenting patient diagnoses in order to obtain higher Medicare reimbursement. These actions include, but are not limited to, altering the physician's diagnosis on the patients chart in order to charge for a more expensive procedure, otherwise known as "upcoding"; providing medical services and durable medical equipment of lesser value than that ordered by the physician and then charging for the item ordered by the physician and; charging for medical services and durable medical equipment not ordered by a physician and not required by the patient.

91.    As a direct and proximate result of Defendants' unlawful conduct in violation of 42 U.S.C. §1395 *et seq.*, the Plaintiff is entitled to all damages and remedies available under 42 U.S.C. § 1320a-7a and 1320a-7b and 31 U.S.C. § 3729 *et. seq.*

## COUNT V
## CHARGING PATIENTS FOR ITEMS WHILE LACKING MEDICAL NECESSITY IN VIOLATION OF 42 U.S.C. § 1395 *et seq.* AND THE FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et. seq.*

92.    Plaintiff realleges and incorporate herein the facts asserted in Paragraphs 1 through 91 above as if set forth herein verbatim.

93.    Defendants were engaged in ongoing and pervasive scheme of charging patients for medical services, supplies and durable medical equipment without a doctor's order and without medical necessity.

94.     As a direct and proximate result of Defendants' unlawful conduct in violation of 42 U.S.C. §1395 *et seq.*, the Plaintiff is entitled to all damages and remedies available under 42 U.S.C. § 1320a-7a and 1320a-7b and 31 U.S.C. § 3729 *et. seq.*

## PRAYER FOR RELIEF

**WHEREFORE**, Relators Jesse Dick, Jr. and Tamela Bragg, on behalf of themselves and the United States of America, request that this Honorable Court grant the following relief:

(a)     That judgment be taken against each named Defendant, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. § 3729, and the costs and expenses, included the costs and expenses of the United States, related to this action;

(b)     That judgment be taken against each named Defendant, in an amount not less than the civil and criminal penalties as set forth in 42 U.S.C. § 1320a-7a and 1320a-7b.;

(c) That the Relators be awarded all costs incurred, including reasonable attorney's fees;

(d) That in the event that the United States intervenes in this action, the Relators be awarded twenty-five percent (25%), but in no event less than fifteen percent (15%) of the proceeds of the resulting judgment in or settlement of this action;

(e) That in the event that the United States does not intervene in this action, the Relators be awarded thirty percent (30%), but in no event less than twenty-five percent (25%) of the proceeds of the resulting judgment in or settlement of this action.

(f) That the Relators be awarded prejudgment interest; and that the United States and the Relators receive all other and further relief that this Honorable Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

**UNITED STATES OF AMERICA ex rel**
**JESSE J. DICK and TAMELA BRAGG**
By Counsel

Matthew S. Criswell, Esq. (WVSB# 8796)
Mark L. French, Esq. (WVSB# 9061)
CRISWELL & FRENCH, PLLC
405 Capitol Street, Suite 1007
Charleston, WV 25301
Telephone:        304.720.6220
Fax: 304.720.6221
        *Counsel for Relators Jesse Dick and Tamela Bragg*

# AFFIDAVIT OF CHRISTINA STOVER

**STATE OF FLORIDA**
**COUNTY OF LEON**, to-wit:

COMES NOW the Affiant, Christina Stover, who swears and says the following:

1.     I am the former Chief Executive Officer ("CEO") of Cornerstone Hospital of Huntington, LLC.

2.     In or around December, 2005, while employed as the CEO at Cornerstone Hospital of Huntington, LLC,  Jesse Dick, our Materials Manger, came into my office to discuss something he had discovered.

3.     Mr. Dick told me that he believed that Cornerstone's billing practices were fraudulent.

4.     Mr. Dick further informed me that he had worked with a woman who was a former Medicare investigator and that she also believed that Cornerstone was submitting false claims to Medicare for reimbursement.

5.     During our conversation, I asked Mr. Dick for a specific example of the fraudulent billing.  Mr. Dick informed me that, among other things, Cornerstone was billing a daily room charge which included three meals a day and if a patient was on internal feeding with a G-Tube, they were charging for that as well.

6.     Mr. Dick told me that he believed that these charges constituted double billing which represented the filing of false Medicare claims.

7.     I informed Mr. Dick that I was unfamiliar with Cornerstone's centralized billing and that it was handled out of our corporate office located in Austin, Texas and

controlled by Cornerstone's Vice President of Finance, Dwight Robinson.

      8.     I further informed Mr. Dick that since Mr. Robinson is not an individual who takes criticism well, I would report the issue to Vince Saunders, Director of Reimbursement.

      9.     Following our conversation, I reported Mr. Dick's concerns to Vince Saunders, Dwight Robinson and Regina Walters.

      10.    No one from Cornerstone ever responded to my inquiry.

      11.    I resigned from Cornerstone on March 8, 2006.

*Christina Stover*

**CHRISTINA STOVER**

Taken, subscribed and sworn to before the undersigned this the 15th day of _____ September _____, 2006.

My Commission expires: DD 593293 .

*Calandra Portalatin*

**NOTARY PUBLIC**



CALANDRA PORTALATIN
MY COMMISSION # DD 593293
EXPIRES: September 10, 2010
Bonded Thru Notary Public Underwriters